# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## CA 11-1464


**CRYSTAL SMITH, ET AL.**

**VERSUS**

**CAPPAERT MANUFACTURED HOUSING, INC., ET AL.**



\*\*\*\*\*\*\*\*\*\*

APPEAL FROM THE
TWELFTH JUDICIAL DISTRICT COURT
PARISH OF AVOYELLES, NO. 2005-7412-B
HONORABLE RONALD D. COX, JUDGE *PRO TEMPORE*

\*\*\*\*\*\*\*\*\*\*

**JIMMIE C. PETERS**
**JUDGE**

\*\*\*\*\*\*\*\*\*\*

Court composed of Oswald A. Decuir, Jimmie C. Peters, and J. David Painter, Judges.


**AFFIRMED AS AMENDED.**


**Fred A. Pharis**
**Pharis Law Offices**
**831 DeSoto Street**
**Alexandria, LA 71301**
**(318) 445-8266**
**COUNSEL FOR PLAINTIFFS/APPELLEES:**
  **Barbara Thronson**
  **Gary Thronson**
  **Judy St. Romain**
  **Rodney St. Romain**

**Hon. Jerold Edward Knoll**
**The Knoll Law Firm, L.L.C.**
**P. O. Box 426**
**Marksville, LA 71351**
**(318) 253-6200**
**COUNSEL FOR PLAINTIFFS/APPELLEES:**
    **Barbara Thronson**
    **Gary Thronson**
    **Judy St. Romain**
    **Rodney St. Romain**


**Albert Dale Clary**
**Adrian G. Nadeau**
**Mark L. Barbre**
**Long Law Firm, L.L.P.**
**4041 Essen Lane, Suite 500**
**Baton Rouge, LA 70809**
**(225) 922-5110**
**COUNSEL FOR DEFENDANT/APPELLANT:**
    **Cappaert Manufactured Housing, Inc.**

**PETERS, J.**

This appeal arises from a suit in redhibition filed by Gary and Barbara Thronson and Rodney and Judy St. Romain[1] against Cappaert Manufactured Housing, Inc. (Cappaert), the manufacturer of the homes at issue. Cappaert now appeals the trial court's judgment rescinding both sales and awarding the plaintiffs monetary damages. For the following reasons, we amend the trial court's award of damages to the Thronsons by giving Cappaert credit for the rental income the Thronsons received after they vacated the home, and affirm the trial court's judgment as amended.

## REVIEW OF THE RECORD

The St. Romains bought their home in 1998, and the Thronsons purchased their home in 2003. The original purchase price for the St. Romains' home was $56,710.00, and the Thronsons paid $26,500.00 for their home. In their January 31, 2005 petition for personal injury damages and recission of the sale, the plaintiffs' main complaint centered around the fact that mold and mildew had become a major problem inside the homes. Expressed in its simplest terms, the mold and mildew complaints related primarily to problems with a vinyl wall covering on the living-space side of each home's walls. When the air conditioning system cooled the home's interior, the hot and humid air that entered the wall cavities from the outside would condense as it passed against the cooled vinyl wall. The moisture that condensed in the wall cavities sustained the growth of mold and mildew. However, the plaintiffs did not assert that the mold and mildew problems were caused solely from the use of the vinyl wall covering on the inside of the walls. They also suggested that other manufacturing defects existed which allowed an

---

[1]The initial suit involved seven other homeowners and a multitude of people who had visited or temporarily resided in the homes at issue as the plaintiffs, but by the time this matter went to trial, only the Thronsons and the St. Romains had not settled or referred their claims to arbitration.

excess of moist outside air to come into the wall cavities. These included leaky air conditioning ductwork, which created a negative pressure in the house, pulling in more moist outside air; and that there existed a lack of return air pathways.

A bench trial resulted in a judgment granting the Thronsons and the St. Romains recission of the sale of their homes and awarding them finance charges, judicial interest, and attorney fees. After the trial court rejected its motion for a new trial, Cappaert perfected this appeal. In its appeal, Cappaert asserts eight assignments of error: 1) the judgment is an absolute nullity, 2) federal HUD standards for manufactured homes preempt Louisiana's law of redhibition, 3) the trial court wrongly interpreted HUD regulations, 4) the plaintiffs' claims were prescribed, 5) the trial court erred in not considering Cappaert Manufacturing Housing's expert witnesses' testimony and erred in relying on testimony from the plaintiffs' expert witness, 6) the award of both contractual and judicial interest was an improper double recovery, 7) the plaintiffs' awards should have been reduced because the plaintiffs lived in or rented their homes through the date of trial, and 8) the trial court erred in finding a redhibitory defect in the St. Romain home.

## OPINION

### *Assignment of Error Number One*

Cappaert argues in its first assignment of error that the trial court judgment is an absolute nullity because the presiding judge's *pro tempore* assignment had ended before the judgment was issued. This issue arises because the matter was initially set for trial before Judge William J. Bennett, but Judge Ronald D. Cox actually heard the trial pursuant to a Louisiana Supreme Court appointment "as judge pro tempore . . . effective for the dates of May 2, 2011 through May 6, 2011,

2

subject to the completion of unfinished business."[2]  Cappaert argues that, because Judge Cox was appointed as a judge *pro tempore*, rather than an ad hoc judge, those actions in the litigation which took place after May 6, 2011, were void.

The change in judges came about because at a status conference held on May 2, 2011, the day before trial, the parties were informed that Judge Bennett's father was to undergo surgery, and Judge Cox would replace him.  Jury selection began on May 3, 2011, and the jury trial itself began the next day.  Two days thereafter, all the claims of the remaining plaintiffs in the litigation were settled except for the redhibition claims of the Thronsons and the St. Romains.  Judge Cox dismissed the jury at this point, and these remaining claims moved forward as a bench trial.

After Judge Cox dismissed the jury on May 4, 2011, he continued hearing the redhibition claims until May 10, 2011.  Judge Cox ultimately rendered written reasons for judgment on May 24, 2011, and executed a written judgment on June 3, 2011.  Cappaert then filed a motion for new trial, which Judge Cox rejected on July 1, 2011.  As his final act in the litigation, Judge Cox signed an order granting Cappaert's appeal on September 2, 2011.

Louisiana Constitution Article Five, Section Five, (A) provides that "[t]he supreme court has general supervisory jurisdiction over all other courts.  It may establish procedural and administrative rules not in conflict with law and *may assign a sitting or retired judge to any court*."  (Emphasis added.)  While it is true that the supreme court's appointment of Judge Cox carried a basic time period

---

[2] In its brief on appeal, Cappaert asserts that it was not aware that Judge Cox was appointed as a judge *pro tempore*, as opposed to an ad hoc judge, until it learned that the supreme court's order was not in the record for appeal.  Cappaert notes that the trial court's minutes indicate that an ad hoc judge was presiding.  After the trial, Cappaert obtained a copy of the supreme court's order and added it to the record in this matter.

from May 2 through May 6, 2011, it also provided that the appointment would be extended "subject to the completion of unfinished business." The conclusion of the ongoing trial, the issuance of written reasons for judgment, the rendering of a judgment, the decision on the motion for new trial, and the grant of a devolutive appeal to this court are all "unfinished business" from this case.

We find no merit in this assignment of error.

### Assignment of Error Number Two

Next, Cappaert asserts that the federal Housing and Urban Development (HUD) standards preempt Louisiana redhibition law for the plaintiffs' allegations regarding vinyl wall covering. We find no merit in this assignment of error as well.

Federal provisions may preempt state law under the theories of express preemption, field preemption, and conflict preemption. Cappaert alleges that the plaintiffs' state law claims for recission of the sales must be dismissed because of conflict preemption, which occurs "when it is impossible to comply with both the federal and state provisions or when application of state law stands as an obstacle to the accomplishment and execution of Congress's full objectives and purposes." *Badon v. R.J. Reynolds Tobacco Co.*, 05-1048, p. 8 (La.App. 3 Cir. 7/12/06), 934 So.2d 927, 933.

In making its argument on this issue, Cappaert directs us to 42 U.S.C.A. § 5403(d), which states in pertinent part that:

> [w]henever a Federal manufactured home construction and safety standard established under this chapter is in effect, no State or political subdivision of a State shall have any authority either to establish, or to continue in effect, with respect to any manufactured home covered, any standard regarding the construction or safety applicable to the same aspect of performance of such manufactured home which is not identical to the Federal manufactured home construction and safety standard. Federal preemption under this subsection shall be broadly and liberally construed to ensure that disparate State or local requirements or standards do not affect the

4

uniformity and comprehensiveness of the standards promulgated under this section nor the Federal superintendence of the manufactured housing industry as established by this chapter.

We note, however, that 42 U.S.C. § 5409(c) states that "[c]ompliance with any Federal manufactured home construction or safety standard issued under this chapter does not exempt any person from any liability under common law." Thus, while Louisiana may not establish its own standards for construction of manufactured housing if they differ from the federal law, claims under state law, including one for recession of a sale, may be brought so long as they advance non-compliance with existing federal regulations or non-compliance with state standards that are not preempted by federal regulations. *In Re: Fema Trailer Formaldehyde Products Liability Litigation*, 620 F.Supp.2d 755 (E.D.La. 2009).

Louisiana Revised Statutes 51:911.23(B), which governs redhibitory actions for manufactured homes, specifically provides that "[i]n any redhibitory action brought against the seller of a manufactured home or mobile home, the standards set forth in the [National Manufactured Housing Construction and Safety Standards Act of 1974, 42 U.S.C. 5401 *et seq.*] shall be considered in establishing and determining whether or not a defect exists." In the matter now before us, the plaintiffs' redhibition claims are based on the assertion that Cappaert did not comply with the federal standards, specifically 24 C.F.R. § 3280.303, which states, in pertinent part:

> (a) Minimum requirements. The design and construction of a manufactured home shall conform with the provisions of this standard. Requirements for any size, weight, or quality of material modified by the terms of minimum, not less than, at least, and similar expressions are minimum standards. The manufacturer or installer may exceed these standards provided such deviation does not result in any inferior installation or defeat the purpose and intent of this standard.

(b) Construction. All construction methods shall be in conformance with accepted engineering practices to insure durable, livable, and safe housing and shall demonstrate acceptable workmanship reflecting journeyman quality of work of the various trades.

When faced with a nearly identical claim of redhibition in a sale of a manufactured home, the court in *Whittington v. Patriot Homes, Inc.*, 2008 WL 1736824 (W.D.La. 2008), held that although the issue of whether the vapor barrier (in this case the vinyl wall) should have been placed on the exterior side of the external walls is preempted by 24 C.F.R. § 3280.504(b), the plaintiffs' claims that were based on allegations that there was excessive duct leakage, leading to excess outside air and moisture entering the house, were not preempted by federal law. We find this decision persuasive. The plaintiffs before us assert claims for redhibition under Louisiana law that rely on defects other than the vinyl wall's placement on the inside of the exterior walls, and these claims are not preempted by the federal regulations governing the design and safety of manufactured homes.

*Assignment of Error Number Three*

In this assignment of error, Cappaert asserts that the trial court erroneously disregarded HUD's own interpretations of its regulations. Cappaert bases this argument on the trial court's conclusion that compliance with 24 CFR § 3280.504, which regulates wall construction standards in manufactured homes, does not inherently constitute compliance with 24 CFR § 3280.303.

When Cappaert built the plaintiffs' homes, the governing standards for "[c]ondensation control and installation of vapor retarders," 24 CFR § 3280.504(b), provided, in pertinent part:

(b) Exterior walls.

(1) Exterior walls must have a vapor retarder with a permeance no greater than 1 perm (dry cup method) installed on the living space side of the wall; or

6

Thus, at that point in time, the HUD regulations specifically allowed Cappaert to install a vinyl wall covering on the living space side of the exterior walls. 24 CFR § 3280.504(B)(1). The plaintiffs do not dispute the fact that this HUD regulation allows the use of vinyl wall covering. Despite acknowledging this fact, the plaintiffs still argue that the construction of the two homes nevertheless violated 24 CFR § 3280.303(b). That regulation, which governs general construction standards, states:

> Construction. All construction methods shall be in conformance with accepted engineering practices to insure durable, livable, and safe housing and shall demonstrate acceptable workmanship reflecting journeyman quality of work of the various trades.

The plaintiffs asserted, and the trial court found, that Cappaert violated this standard in its construction of the plaintiffs' homes. Specifically, in a humid climate such as South Louisiana, the use of the vinyl wall covering coupled with other defects that cause excess warm, moist air to enter the wall cavities can cause problems with condensation, which leads to the growth of mold and mildew.

On appeal Cappaert argues that HUD interprets its rules to conclude that compliance with 24 CFR § 3280.504(B)(1) precludes a finding that the homes did not meet the acceptable workmanship standards found in 24 CFR § 3280.303(b). In support of its argument, Cappaert introduced a letter, dated January 19, 2007, from William W. Matchneer, IIII, an associate deputy assistant secretary for Regulatory Affairs and Manufactured Housing, to Brian D. Cooney, the vice president of government affairs at the Manufactured Housing Institute in Arlington, Virginia. The letter reads as follows:

> Following up on our December meeting with you and your colleagues, we have had a chance to review the plaintiffs' pleadings you have provided us on various vapor barrier cases. As the HUD official responsible for the enforcement of the Manufactured Home Construction and Safety Standards, I can say that these pleadings

completely misrepresent HUD enforcement policy by arguing that HUD's general standard at 3280.303(b) should be applied to manufacturers' practices regarding the placement of vapor barriers even though these manufacturers have complied with HUD's more specific vapor barrier standard at 3280.504(b).

Consistent with basic principles of administrative law, it is HUD's practice to hold manufacturers accountable for compliance with the standard that most specifically applies to a particular aspect of construction. Accordingly, there is no case in which HUD has applied 3280.303(b) to a manufacturer that has complied with 3280.504(b).

Thank you again for bringing this situation to our attention. HUD has a distinct interest in maintaining an accurate understanding by arbitrators and the courts of HUD's enforcement policies regarding the Manufactured Home Construction and Safety Standards. We would be especially concerned by a reported judicial decision that misstated HUD policy and practice, so please keep us apprised of development in these cases.

The general rule is that "[a] reviewing court should afford considerable weight to an administrative agency's construction and interpretation of its rules and regulations adopted under a statutory scheme that the agency is entrusted to administer, and its construction and interpretation should control unless they are found to be arbitrary, capricious, or manifestly contrary to its rules and regulations." *Forbes v. Cockerham*, 08-762, p. 33 (La. 1/21/09), 5 So.3d 839, 859. However, the letter, which purports to set out HUD's interpretation of the regulations, does not address the specific issues before this court in this lawsuit. It only addresses situations in which the homeowner's sole complaint is that the vapor barrier was installed on the inside living surface of the wall. In the case before us, the homeowners claim that there were other causes of the mold and mildew: faulty wall construction and design; unsealed wall cavity penetrations allowing hot, humid air into the wall cavity; crushed, improperly constructed air conditioning ducts; mis-cut air conditioning vents; and a lack of return air

8

pathways. Thus, even assuming that this letter set out the proper interpretation of HUD standards, it does not affect the issues before us.

We find no merit in this assignment of error.

### *Assignment of Error Number Four*

In this assignment of error, Cappaert argues that the trial court erred in not finding that the plaintiffs' claims were prescribed pursuant to the one year prescription period provided for in La. Civil Code art. 2534.[3] Specifically, Cappaert contends that the evidence establishes that more than one year had lapsed between the time that the plaintiffs had knowledge of the moisture in their homes and the filing of their lawsuit.

The record reflects that on September 24, 2007, Cappaert filed a peremptory exception of prescription as to the St. Romains' redhibition and personal injury claims, and on October 3, 2007, filed a similar exception as to the Thronsons' redhibition and personal injury claims. The trial court held a hearing on these exceptions on November 30, 2007, and the trial court minutes of that day state that six individuals, including Gary Thronson and Rodney and Judy St. Romain, testified. The minutes further state that the trial court rejected the exceptions with

---

[3] Louisiana Civil Code Article 2534 governs prescription in an action for redhibition. It provides:

      A. (1) The action for redhibition against a seller who did not know of the existence of a defect in the thing sold prescribes in four years from the day delivery of such thing was made to the buyer or one year from the day the defect was discovered by the buyer, whichever occurs first.

      (2) However, when the defect is of residential or commercial immovable property, an action for redhibition against a seller who did not know of the existence of the defect prescribes in one year from the day delivery of the property was made to the buyer.

      B. The action for redhibition against a seller who knew, or is presumed to have known, of the existence of a defect in the thing sold prescribes in one year from the day the defect was discovered by the buyer.

      C. In any case prescription is interrupted when the seller accepts the thing for repairs and commences anew from the day he tenders it back to the buyer or notifies the buyer of his refusal or inability to make the required repairs.

9

oral reasons. The trial court minutes of December 19, 2007, state that the trial court executed a judgment on that day in accordance with its oral reasons rendered on November 30, 2007. What the record before us does not contain is a transcript of the November 30, 2007 hearing, a copy of the trial court's oral reasons for judgment, nor a copy of the December 19, 2007 judgment.

When perfecting its appeal, Cappaert designated those portions of the lower court record it desired to constitute the record on appeal, pursuant to La.Code Civ.P. art. 2128. However, Cappaert did not designate the hearing on the exceptions, the trial court's reasons for judgment, or the judgment on the exceptions as a part of the appeal record. Louisiana Code of Civil Procedure Article 2128 states that when an appellant designates the portions of the record it desires to constitute the record on appeal, either "a party or the trial court may cause to be filed thereafter any omitted portion of the record as a supplemental record." However, this court is not given the authority under that article to designate a portion of the trial court record as a supplemental record. Accordingly, we are bound to presume that the trial court's decision on the peremptory exceptions of prescription were "correct and supported by sufficient competent evidence." *Boulet v. Foti*, 539 So.2d 843, 845 (La.App. 3 Cir.), *writ denied*, 541 So.2d 841 (La.1989).

### *Assignment of Error Number Five*

Cappaert argues in this assignment of error that the trial court erred when it gave little weight to the testimony of its expert witnesses (Harold Lloyd Mouser, Michael Zieman, and John Stephen Verett) and instead relied on the plaintiffs' expert witnesses (Bobby Parks and Sammy James Hoover) in reaching its factual

findings. Cappaert bases this argument on the assertion that Mr. Parks' testimony was "unreliable."

Louisiana Code of Evidence Articles 701 through 706 govern the use of expert witnesses. With regard to the relationship between the trial court and the expert witness, La.Code Evid. art. 702 provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

It is well-settled that "[t]he effect and weight to be given expert testimony is within the broad discretion of the trial judge." *Pendleton v. Barrett*, 97-570, p. 4 (La.App. 3 Cir. 12/23/97), 706 So.2d 498, 501. We also recognize that a trial court is not bound by expert testimony; after weighing and evaluating the expert testimony the court has the power to substitute its own judgment and common sense for the conclusion of an expert witness where the evidence as a whole warrants doing so. *Ryan v. Zurich Am. Ins. Co.*, 07-2312 (La. 7/1/08), 988 So.2d 214. Most importantly, "[w]here the testimony of expert witnesses differ, it is for the trier of fact to determine the most credible evidence and a finding of fact in this regard will not be overturned absent manifest error." *Opelousas Prod. Credit Ass'n v. B.B. & H., Inc.*, 587 So.2d 812, 814 (La.App. 3 Cir. 1991) (citing *Nailor v. Int'l Harvester Co.*, 430 So.2d 784 (La.App. 5 Cir.), *writ denied*, 437 So.2d 1148 (La.1983)).

All five individuals cited by Cappaert in this assignment of error were accepted by the trial court as expert witnesses. The trial court recognized Mr. Hoover, a Baton Rouge, Louisiana Deputy State Fire Marshall who heads the HUD consumer complaint program for Louisiana, as an expert in HUD compliance. Mr. Parks, a West Monroe, Louisiana resident and owner of Health Homes of

11

Louisiana, a consulting firm that works with six manufactured housing builders in recognizing and fixing problems, was recognized by the trial court as an expert in building science as it pertains to moisture identification and cause and effect in the construction of homes; in HVAC (air conditioning) operation, performance, design, and sizing; mold testing, remediation and analysis of samples; and on portions of the HUD code that pertains to the performance standards of manufactured homes. The trial court accepted Mr. Mouser, a Vicksburg, Mississippi consultant, as an expert in field inspections on behalf of manufacturers, in the knowledge of manufacturers' costs to cure a sub-standard building, in the installation of manufacturers' homes, and in compliance with the manufacturers' instructions and field inspections of installations. Mr. Zieman, a resident of Long Beach, California, and president of RADCO, a company that performs consulting, engineering, and laboratory testing, was recognized by the trial court as an expert in mechanical engineering, manufactured homes, air conditioning design and inspections, and design and inspection for HUD homes. Finally, the trial court recognized Mr. Verett, a consultant with Environmental Measurements Corporation, as an expert in industrial environmental quality, including sampling for mold, interpreting laboratory data from mold samples, and in determining the source of mold.

Mr. Hoover testified that he first visited the St. Romain house on April 15, 1999, and in September of 2003 was still looking for the root causes of the problems with the homes Cappaert built. On September 8, 2003, the St. Romains complained to his office that mold had appeared in three closets, and that despite having cleaned it twice before, the mold had returned. Additionally, mold had begun to manifest itself in the bedroom. These complaints were verified by an October 6, 2003 on-site visit by Roger Smith, an inspector working for Mr. Hoover.

12

Cappaert made some unsuccessful attempts to rectify the problems, but on January 14, 2004, Mr. Hoover found it necessary to impose a fine on Cappaert for not making repairs to the St. Romain home. On October 26, 2004, Mr. Hoover found evidence of high moisture in the wall boards in a guest bedroom and the master bathroom.

Mr. Hoover was of the opinion that over-sizing the air conditioning system could lead to moisture problems because the unit would not run long enough to dehumidify the air. In February of 2005, Mr. Hoover sent the St. Romains a letter informing them that he was going to turn over his file on their issues to HUD and that they should consider suing Cappaert. He then closed his file and had no further involvement with the issues now before the court.

Mr. Parks became involved in 2004 when Mike Camerasano, the acting president of the Manufactured Housing Commission from West Monroe, Louisiana, asked him to examine seven homes, identify the primary reasons for moisture problems, and recommend corrective measures. The St. Romain home was one of the seven.

According to Mr. Parks, the moisture problems in the plaintiffs' homes was not caused solely by the vinyl wall covering. Rather, he opined that it was caused by the outer shell of the houses allowing too much moist air into the wall cavities. He asserted that when the warm moist air came in contact with the vinyl-covered wall boards (which had become chilled by the air conditioning inside the homes), condensation occurred inside the wall cavities. Mr. Parks explained that because the wall cavities were not well ventilated, there was no way for the walls to dry out after they became wet from the condensation, and mold occurred. According to Mr. Parks, the vinyl wall covering would not have been a problem if the outer shell

13

of the houses had prevented moisture from coming into the wall cavities in the first place, or if there was some way to vent the moist air. Mr. Parks identified leaky air conditioning ducts as another cause of the moist air entering the wall cavities and explained that that when the air conditioning ducts leak excessively, they create negative pressure inside the house and pull more warm, moist air into the home. He did acknowledge, however, that an oversized air conditioning systems, which would not be attributable to Cappaert, could contribute to moisture in the homes.

When Mr. Parks inspected the St. Romains' home in 2004, the St. Romains had their original four-ton air conditioning system. He found that an I-beam had crushed some of the ductwork in the home and that the home had considerable duct leakage, causing the home to depressurize at a significant rate with reference to the outdoors. Photographs taken in June of 2004 revealed the presence of visible mold on the ceiling and walls. Mr. Parks observed additional fungal growth around a few light switches and around the top of some molding. He also noticed some leaking along the wall where the two sides of the manufactured home were joined together. Photos taken by him in February of 2007 showed the ceiling starting to crack and mold and light switches pulling out of the walls from the moisture content in the walls.

When Mr. Parks returned to the St. Romain home on June 5, 2007, the St. Romains had replaced the original air conditioning unit with an oversized, five-ton air conditioning system. During his inspection, Mr. Parks found moisture in the walls and took samples of the trapped air. Those samples, together with trapped mold spores he recovered, were sent to a laboratory for analysis. He observed that none of the problems he had observed in 2004 had been corrected. In fact, they were getting progressively worse. During his inspection on this date, he peeled the

14

vinyl wall covering off some of the walls to observe how the wall cavity performed. In doing so, he discovered that only the outside and mating walls had an elevated moisture content.

When he returned for another inspection in 2008, Mr. Parks observed that the problems were still present. In his opinion, the mold growth was so extensive that to remedy the situation would require a major rebuild. His 2009 inspection revealed that the moisture levels varied depending on the presence or absence of the vinyl wall covering. On those walls where the vinyl wall board was intact, moisture remained. On those walls where the vinyl wall board had been removed, the moisture levels were nonexistent.

With regard to the Thronsons' home, Mr. Parks inspected the premises in 2007 and found that the home had duct leakage and depressurization inside the wall cavities. Mold samples taken at that time revealed an excess mold spore count, and the inspection showed that the walls had significant moisture accumulating inside them.

Mr. Parks testified that, in his opinion, the quality of construction on both the plaintiffs' homes was generally sub-par. He did not find their construction to be in compliance with the HUD general quality standard of a quality, safe product. According to Mr. Parks, the primary issues causing the moisture problems related to Cappaert's failure to properly construct the wall cavities, the severe air conditioning duct leakage, and the improper air pathways. Mr. Parks testified that all of these problems were manufacturing defects.

Mr. Mouser testified that he had spent thirty to thirty-five years of his career working with manufactured housing and that from 1995 until 2004, he had been employed by Cappaert in charge of the quality control program. At the time he

testified, he was still associated with Cappaert as a consultant on compliance and quality control coordination.

Mr. Mouser first inspected the St. Romains' home on February 8, 2007. He testified that during his inspection, he observed areas of moisture problems in two bedrooms and one bedroom closet, floor discoloration around the location of the original air conditioning unit, and ceiling stains in two guest bedrooms. Mr. Mouser also observed that front, back, and side porches had been added to the home, causing penetrations into the outside wall. Additionally, according to Mr. Mouser, the slope of the side porch caused water to drain toward the home instead of away from it. He found that some of the duct work was not sealed and that the wall around where the original HVAC system had been placed was crumbly and soft. Mr. Mouser agreed with Mr. Parks that some of the ductwork was crushed, that this defect was a manufacturing defect, and that it would cause problems. According to Mr. Mouser, leaking ducts would cause pressure and balance problems, but when he performed his inspection, the whole house ventilation system had been removed. He noted that in 1999, or the year after the St. Romains purchased their home, Cappaert had added ten ventilation vents to the roof to help with condensation. Mr. Mouser opined that this lack of proper ventilation was the result of a mistake at the factory.

A few months later, on June 1, 2007, Mr. Mouser inspected the Thronsons' home. In performing his inspection, he observed humidity deflections on the front walls in the front bedroom and all down the hall. However, he found no moisture problems within the wall when he removed the electrical outlets from the wall. Mr. Mouser suggested that the home thermostat was affected by its closeness to the refrigerator, and that the air conditioning unit did not have the air intake hose

16

properly attached. This latter defect, according to Mr. Mouser, contributed to the influx of humid outside air. Mr. Mouser testified that there existed general problems with duct leakage in this class of homes because of manufacturing defects.

Mr. Zieman testified that he examined neither home at issue in this litigation but that he had investigated similar complaints from 2004 through 2007. He disagreed with Mr. Parks' methods of investigating and measuring the air conditioning pressure systems and suggested that the HUD standards did not have a performance requirement concerning an excessive ventilation rate or leaky construction of duct works. Mr. Zieman attributed all the problems with the St. Romain home to the installation of the larger air conditioning unit, which he suggested was not properly connected and which would have an impact on the moisture and condensation in the home. In his opinion, the too-large air conditioning unit left too much humidity in the air and created high pressure in the ducts, causing them to leak. He also suggested that the moisture problems in the St. Romain home could have been caused by an improper seal on the mating wall and said that this would not be a manufacturing defect. In his opinion, the St. Romain home suffered no HUD code violations during the manufacturing process.

With regard to the Thronson home, Mr. Zieman suggested that the moisture was able to come into the home through a hole in the floorboards caused when the new air conditioner was installed. Mr. Zieman testified that if a manufacturer followed HUD standards, there would not be excessive condensation.

Citing to a 2008 or 2009 American Industrial Hygiene Association document, Mr. Verett criticized Mr. Parks' wall cavity samples, stating that the methods used were imprecise and non-reliable and that Mr. Parks' samples were

too small to be reliable.  According to Mr. Verett, the mere existence of mold does not in itself indicate the presence of too much moisture in the home, as some molds grow at low moisture levels.  He admitted, however, that he was reluctant to form an opinion about the causes of the mold without a site visit.

In its written reasons for judgment, the trial court made these specific findings:

> The Court carefully listened to all witnesses and makes the following observations.  The most credible witnesses, besides the plaintiffs who seemed very genuine in their stress and depression from living in such deplorable homes was Sammy James Hoover, the Deputy State Fire Marshall who at the time of these complaints was the compliance officer and handled consumer complaints for the State and Robert Parks, who was hired by the Louisiana Manufactured Housing Commission to examine several of the homes made by Cappaert and report his findings as to the complaints received and problems, if any, that he observed.  The Court gave less weight to the testimony of Harold Lloyd Mouser, who had worked for Cappaert and other manufacturers since 1976 and Steven Verret [sic].  The testimony of Mr. Verret [sic] was obviously biased, not supported by other evidence and his conclusions, without ever observing either of these two homes, [were] not believable.

We find no manifest error in the trial court's reliance on the plaintiffs' experts rather than Cappaert's experts, and there is no merit in this assignment of error.

*Assignment of Error Number Six*

The trial court awarded the St. Romains $109,645.10, stating that this amount "represent[ed] a return of the purchase price and expenses."  The trial court also ordered that legal interest be paid on $56,710.00 of that amount (the purchase price of the home) from the date of sale and on the remaining $52,953.19 from the date of judicial demand.  The trial court awarded the Thronsons $35,972.31, "representing a return of the purchase price and expenses."  The trial court also awarded legal interest on $26,500.00 (the purchase price of the home) from the

date of sale and legal interest on the remaining $9,472.31 from the date of judicial demand.

In this assignment of error, Cappaert asserts that by awarding the plaintiffs the return of the contractual interest they had paid in connection with financing the homes and judicial interest on the expenses associated with the sale, which included that contractual interest, the trial court gave the plaintiffs a double recovery. In making its argument, Cappaert cites this court's opinion in *Aucoin v. Southern Quality Homes*, 06-979 (La.App. 3 Cir. 2/28/07), 953 So.2d 856, *aff'd in part, rev'd in part*, 07-1014 (La. 2/26/08), 984 So.2d 685. In *Aucoin*, however, this court was affirming the trial court's decision not to award both the actual interest paid and judicial interest and cited no cases in support of its decision. The supreme court did not address this issue in its subsequent opinion. We decline to follow this court's decision in *Aucoin*.

When a court grants redhibition of a sale, the contractual interest expended in financing the sale is considered both a recoverable expense occasioned by the sale, La.Civ.Code art. 2531, and an expense incurred for the preservation of the thing, La.Civ.Code art. 2535. *Carpenter v. Lafayette Woodworks, Inc.*, 94-1011 (La.App. 3 Cir. 2/1/95), 653 So.2d 1187. Louisiana Revised Statutes 13:4203 provides for judicial interest from the time that suit was filed on all judgments sounding in damages *ex delictu*. Accordingly, the trial court did not err in ordering judicial interest from the date that suit was filed on the expenses occasioned by the sales and financing of the homes, which includes the contractual interest they paid due to financing the sales.

We find no merit in this assignment of error.

19

*Assignment of Error Number Seven*

In this assignment of error, Cappaert asserts that the trial court should have reduced the plaintiffs' awards and given it the benefit of a credit for use, since the plaintiffs continued to live in and/or rent their homes from the time of purchase through trial.

Louisiana Civil Code Article 2545 provides that a seller who knows that the item sold has a defect "*may* be allowed credit" for the buyer's use of the thing or the fruits it might have yielded. (Emphasis added.) This Article also provides that a seller who is the manufacturer of a thing "is deemed to know that the thing he sells has a redhibitory defect." Thus, whether to grant Cappaert a credit for any use that the St. Romains or the Thronsons made of their homes is subject to the trial court's discretion. In order to receive consideration for that credit, the seller must present evidence of the value of the buyer's use of the property. *Brannon v. Boe*, 569 So.2d 1086 (La.App. 3 Cir. 1990). Additionally, compensation for the buyer's use should not be granted automatically since "even the value of an extensive use may be overridden by great inconveniences incurred because of the defective nature of the thing and constant interruptions in service caused by the seller's attempts to repair." *Alexander v. Burroughs Corp.*, 359 So.2d 607, 611 (La. 1978).

Cappaert presented no evidence concerning the value of the St. Romains' use of the property. Given the lack of evidence, we find no abuse of discretion in the trial court's denial of a use credit to Cappaert.

With regard to the Thronsons, the evidence establishes that they moved from their home in the summer of 2004, and they began renting it to Mr. Thronson's brother for $329.97 per month. At the time of the May 3, 2011 trial, Mr.

Thronson's brother and his family were still living there. However, there was also extensive testimony concerning the severe defects in the Thronsons' home, the numerous repairs it underwent, and all the inconveniences entailed by the defects and the repairs. We conclude that the trial court did not abuse its discretion in denying Cappaert a credit for the Thronsons' use of the home through the summer of 2004, but that it did abuse its discretion in failing to award Cappaert a credit for the income the Thronsons received from renting their home thereafter. Accordingly, we amend the trial court's judgment to grant Cappaert a credit of $329.97 per month for the six years and ten months that Mr. Thronson's brother rented the Thronsons' home.

*Assignment of Error Number Eight*

Finally, Cappaert argues that the trial court erred in finding that the St. Romains' home had redhibitory defects. Specifically, Cappaert asserts that the St. Romains' evidence was "unscientifically reliable" and that all the air conditioning experts testified that the air conditioning systems, for which Cappaert is not responsible, likely caused any moisture issues.

As we noted in discussing the fifth assignment of error, the trial court did not abuse its discretion by choosing to find the St. Romains' experts more credible and holding that the St. Romain's home had redhibitory defects. We find no merit in this assignment of error.

**DISPOSITION**

For the foregoing reasons, we amend the trial court judgment to give Cappaert Manufactured Housing, Inc., a $27,057.54 credit against the judgment rendered in favor of Gary E. Thronson, II, and Barbara Butrich Thronson. We

21

affirm the trial court judgment in all other respects.  We assess all costs of this appeal to Cappaert Manufactured Housing, Inc.

**AFFIRMED AS AMENDED.**