# STATE OF LOUISIANA
# COURT OF APPEAL, THIRD CIRCUIT

# 14-723


RODNEY BLACKSHEAR, ET AL.

VERSUS

GOLDEN AGE NURSING CENTER, LLC, ET AL.


\*\*\*\*\*\*\*\*\*\*

APPEAL FROM THE
TWENTY-EIGHTH JUDICIAL DISTRICT COURT
PARISH OF LASALLE, NO. 36082
HONORABLE J. CHRISTOPHER PETERS, DISTRICT JUDGE

\*\*\*\*\*\*\*\*\*\*

## JOHN E. CONERY
## JUDGE

\*\*\*\*\*\*\*\*\*\*

Court composed of John D. Saunders, Elizabeth A. Pickett, and John E. Conery, Judges.


**AFFIRMED.**

**Sage L. Middleton**
**Todd A. Townsley**
**Townsley Law Firm**
**3102 Enterprise Boulevard**
**Lake Charles, Louisiana 70601**
**(337) 478-1400**
**COUNSEL FOR PLAINTIFF/APPELLANT:**
    **Rodney Blackshear**
    **Ms. Edith Blackshear (deceased)**


**Elizabeth F. Shea**
**J. Gregory Bergstedt**
**Fraser, Wheeler, & Bergstedt**
**4350 Nelson Road**
**Lake Charles, Louisiana  70606**
**(337) 478-8595**
**COUNSEL FOR DEFENDANT/APPELLEE:**
    **Eulogio L. Tan, M.D.**

**CONERY, Judge.**

This medical malpractice action was filed by Rodney Blackshear, individually and on behalf of his deceased mother, Ms. Edith Blackshear. Ms. Blackshear died seven days after having her PEG tube replaced by defendant, Doctor Eulogio Tan. After a trial on the merits, the jury found that Doctor Tan had breached the standard of care in his treatment of Ms. Blackshear, but that Doctor Tan had not caused harm to Ms. Blackshear. Plaintiff appeals the judgment of the trial court. For the following reasons, we affirm.

## FACTS AND PROCEDURAL HISTORY

Ms. Blackshear was an eighty-four year old nursing home resident who presented at Hardtner Medical Center around 10:00 p.m. on July 1, 2005. Ms. Blackshear had allegedly pulled out her percutaneous endoscopic gastrostomy (PEG) tube.[1] Ms. Blackshear was seen by Doctor Eulogio Tan, an emergency medicine physician. After physical examination, Doctor Tan observed that Ms. Blackshear had normal vital signs, was not in any distress, had a soft and tender abdomen, and had normal heart rate and respirations. Without confirming how long the PEG tube had been in place, or exactly when Ms. Blackshear had allegedly pulled it out, Doctor Tan then replaced Ms. Blackshear's PEG tube and allegedly verified its placement by auscultation[2] and "some aspiration,"[3] neither of which was documented in the medical records.

---

[1] A PEG tube is commonly referred to as a "feeding tube." The PEG tube/feeding tube as issue in this case will be referred to as a PEG tube throughout this opinion for consistency.

[2] Auscultation is a clinical method used to ensure that the PEG tube is placed properly in the stomach. It is the process of injecting air by syringe through the PEG tube and "listening" for the normal sounds that occur when air enters the stomach.

After concluding that Ms. Blackshear had tolerated the replacement of the PEG tube well and that she was not in any distress, Doctor Tan discharged her. Ms. Blackshear returned to the nursing home around 1:30 a.m. on July 2, 2005. Feeding was resumed through the PEG tube shortly after Ms. Blackshear's return to the nursing home, and a nurse noted that Ms. Blackshear was resting comfortably. At 9:00 a.m., Ms. Blackshear vomited, after which her health then steadily declined.

By 10:30 a.m., Ms. Blackshear was in enough pain to warrant pain medication. At 2:30 p.m., Ms. Blackshear was pale, having trouble breathing, had low oxygen saturation, and was found to be in respiratory distress. Ms. Blackshear was then brought back to Hardtner Medical Center at approximately 3:30 p.m. with a chief complaint of respiratory distress and a tender abdomen on palpation. When her condition did not improve, Ms. Blackshear was transferred to Rapides Regional Medical Center a little after 8:00 p.m. on July 2, 2005, where she was admitted by Doctor Jonathan Hunter, a family physician practicing at Rapides Regional Medical Center. An x-ray with Gastrografin dye taken at 9:24 p.m. showed that the PEG tube was in place, as the dye went into the stomach with no extravasation.[4]

When Ms. Blackshear's symptoms did not improve, Doctor Hunter ordered a CT scan of Ms. Blackshear's abdomen taken the next morning on July 3, 2005, at 10:30 a.m. The CT scan showed that the PEG tube was completely out of the stomach. Doctor John McGinity, a general surgeon at Rapides Regional Medical

___

[3] Aspiration is another clinical method for ensuring proper placement of a PEG tube and is the process of taking a syringe and pulling back on the tube, once inserted into the stomach, to ensure that what comes out of the tube is stomach contents.

[4] Extravasation is leaking, discharge, or escape of fluids.

Center, was called in for a consult, and he immediately performed surgery on Ms. Blackshear, where he discovered a "large stomach laceration at the greater curvature of the old G-tube site." Doctor McGinity repaired the stomach, removed infection from the peritoneal cavity, and surgically inserted a new PEG tube. Ms. Blackshear was then transferred to the ICU on July 3, 2005. Ms. Blackshear died in the ICU a few days later on July 8, 2005.

Rodney Blackshear, individually and on behalf of his deceased mother, Ms. Blackshear, filed a claim for medical practice and damages against Golden Age Nursing Center, L.L.C., LaSalle Hospital Service District #1 d/b/a Hardtner Medical Center, and Eulogio L. Tan, M.D. In accordance with the Louisiana Medical Malpractice Act, a medical review panel (MRP) was empaneled, which consisted of three physicians practicing the medical specialty of emergency medicine. The MRP unanimously found that the evidence did not support a conclusion that defendants had breached the standard of care in treating Ms. Blackshear. Plaintiff's claims against both Golden Age Nursing Center and Hardtner Medical Center were dismissed on motions for summary judgment. Hardtner Medical Center's motion for summary judgment was granted on March 3, 2009, while Golden Age Nursing Center's motion for summary judgment was granted on August 7, 2009. The summary judgment filed by Doctor Tan was denied, and Plaintiff's claims against Doctor Tan proceeded to a jury trial on March 3, 2014. The jury found on special interrogative that Doctor Tan had breached the standard of care, but that Doctor Tan had not caused harm to Ms. Blackshear, or her son, Rodney. A final judgment consistent with the jury's verdict was signed on March 28, 2014. Rodney timely appeals the judgment of the trial court. We find that Rodney's assignment of error lacks merit and affirm.

## ASSIGNMENT OF ERROR

Plaintiff/appellant asserts the following as an assignment of error on appeal:

The jury manifestly erred in finding that Dr. Tan did not cause Mrs. Blackshear any harm when he breached the standard of care by not placing the feeding tube into the stomach, and in light of the fact that there is no factual support for the assertion that Mrs. Blackshear pulled the tube out between 9 PM on July 2 and 11AM on July 3.

## LAW AND ANALYSIS

Louisiana Revised Statutes 9:2794 states, in pertinent part:

A. In a malpractice action based on the negligence of a physician licensed under R.S. 37:1261 et seq., a dentist licensed under R.S. 37:751 et seq., an optometrist licensed under R.S. 37:1041 et seq., or a chiropractic physician licensed under R.S. 37:2801 et seq., the plaintiff shall have the burden of proving:

(1) The degree of knowledge or skill possessed or the degree of care ordinarily exercised by physicians, dentists, optometrists, or chiropractic physicians licensed to practice in the state of Louisiana and actively practicing in a similar community or locale and under similar circumstances; and where the defendant practices in a particular specialty and where the alleged acts of medical negligence raise issues peculiar to the particular medical specialty involved, then the plaintiff has the burden of proving the degree of care ordinarily practiced by physicians, dentists, optometrists, or chiropractic physicians within the involved medical specialty.

(2) That the defendant either lacked this degree of knowledge or skill or failed to use reasonable care and diligence, along with his best judgment in the application of that skill.

(3) That as a proximate result of this lack of knowledge or skill or the failure to exercise this degree of care the plaintiff suffered injuries that would not otherwise have been incurred.

In reviewing medical malpractice cases, our standard of review is well-established. Our court has stated:

"A fact finder's determinations regarding whether a plaintiff proved the elements of the burden of proof of La.R.S. 9:2794 are findings of fact. *Salvant v. State,* 05-2126 (La.7/6/06), 935 So.2d 646." *Doyle v. Ramos,* 13–1143, p. 5 La.App. 3 Cir. 3/5/14), 134 So.3d 92, 96. As such, we review the jury's findings of fact using the clearly wrong or manifest error standard of review. *Id.*

*Jordan v. Rapides Reg'l Med. Ctr.*, 14-124, pp. 8-9 (La. App. 3 Cir. 10/1/14), ___ So.3d ___ (quoting *Salvant v. State*, 05-2126 (La. 7/6/06), 935 So.2d 646). Thus, in the instant case, we review the jury's findings of fact under the manifest error, or clearly wrong, standard of review.

"[A]ppellate jurisdiction of a court of appeal extends to law and facts." La.Const. art. 5, § 10(B). The appellate court must determine whether the trial court committed an error of law or made a factual finding that was manifestly erroneous or clearly wrong. *Gibson v. State,* 99-1730 (La. 4/11/00), 758 So.2d 782, *cert. denied,* 531 U.S. 1052, 121 S.Ct. 656 (2000). The reviewing court must review the record in its entirety to make this determination. *Stobart v. State, Dep't of Transp. and Dev.,* 617 So.2d 880 (La.1993). "Even though an appellate court may feel its own evaluations and inferences are more reasonable than the factfinder's, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review where conflict exists in the testimony." *Id.* at 882.

Further, "where two permissible views of the evidence exist, the factfinder's choice between them cannot be manifestly erroneous or clearly wrong." *Id.* at 883. *See Darbonne v. Wal-Mart Stores, Inc.*, 00-551 (La.App. 3 Cir. 11/2/00), 774 So.2d 1022. Additionally, "When the district court has permitted both parties to present their experts before making its factual determinations, the fact finder's choice of alternative permissible views cannot be considered to be manifestly erroneous or clearly wrong." *Houssiere v. ASCO USA*, 12-791, p. 12 (La.App. 3 Cir. 1/16/13), 108 So.3d 797, 805-6 (quoting *Dumesnil v. Sw. La. Elec. Membership Corp.*, 08-982, p. 6 (La.App. 3 Cir. 2/4/09), 2 So.3d 1254, 1258), *writ*

5

*denied*, 13-693 (La. 5/17/13), 118 So.3d 377. Furthermore, "[w]here the testimony of expert witnesses differ, it is for the trier of fact to determine the most credible evidence and a finding of fact in this regard will not be overturned absent manifest error." *Smith v. Cappaert Manufactured Hous., Inc.*, 11-1464, p. 11 (La.App. 3 Cir. 4/10/12), 89 So.3d 1234, 1242-3 (quoting *Opelousas Prod. Credit Ass'n v. B.B. & H., Inc.*, 587 So.2d 812, 814 (La.App. 3 Cir.1991)), *writs denied*, 12-1418 (La. 10/8/12), 98 So.3d 857 and 12-1516 (La. 10/12/12), 98 So.3d 871. *See also Revel v. Snow*, 95-462 (La.App. 3 Cir. 11/2/95), 664 So.2d 655, *writ denied*, 95-2820 (La. 2/2/96), 666 So.2d 1084.

In the instant case, the jury found the Doctor Tan had breached the standard of care, but that the breach did not cause harm to Ms. Blackshear. Rodney alleges on appeal that the jury erred in finding that Doctor Tan did not harm Ms. Blackshear in his replacement of the PEG tube. At trial, the jury heard and saw the testimonies of Doctor Fred Yates, Doctor Jonathon Hunter, Doctor Ronald Paynter, Doctor Michael McGinity, and Doctor Eulogio Tan.

Doctor Fred Yates testified at trial as an expert in emergency medicine. He testified that he has replaced about 100 PEG tubes, but that he had not replaced any in about one year. Doctor Yates served on the MRP that reviewed the claims of Rodney on behalf of Ms. Blackshear against Doctor Tan. The MRP concluded that Doctor Tan did not breach the applicable standard of care stating, "After a careful review of all evidence submitted for our review, we find that the actions of defendants herein, . . . did not constitute a deviation from the applicable standard of care." Further, the MRP stated, "With respect to Dr. Eulogio Tan, the panel finds that his placement of the PEG tube appears to have been accomplished timely

6

and properly. There was no basis for this defendant to suspect that the patient had sustained a stomach laceration."

Doctor Yates testified that when a patient presents with the need of a PEG tube replacement, the first thing that is done is a history and physical exam. A doctor replacing a PEG tube determines how long the tube has been in place, and whether the PEG tube tract is mature, roughly between two and four weeks old. According to Doctor Yates, the emergency room doctor would then replace the tube and check for its correct placement. Doctor Yates testified that the standard to verify placement is auscultation, which is to push air through a syringe and listen for "characteristic sounds that you hear when air enters the stomach." Further, the doctor may also retract on the syringe to see if the stomach contents come out, which is referred to as aspiration. Doctor Yates testified that auscultation and aspiration are the two clinical ways to verify replacement of a PEG tube. Doctor Yates testified that an x-ray with Gastrografin dye could be done to verify placement, but doing so is definitely not the standard.

Doctor Yates testified that he had not seen a stomach laceration caused by PEG tube replacement, and that such a result was a very unlikely event. Further, Doctor Yates testified that the MRP "felt like something else may have happened" to cause the stomach laceration. According to Doctor Yates, Doctor Tan verified the placement of the PEG tube clinically, which was within the applicable standard of care. After sitting on the MRP and revisiting the information for trial preparation, Doctor Yates still concluded at trial that Doctor Tan had not breached the standard of care in doing exactly what he would have done in the same scenario.

Doctor Jonathon Hunter testified at trial as an expert in emergency medicine. Doctor Hunter testified that in his experience, a dislodged PEG tube is "a very, a

7

very common issue in the emergency department." He further testified that he has seen dislodged PEG tubes in the emergency room at each facility he has worked. Doctor Hunter was assigned to Ms. Blackshear when she was admitted to Rapides Regional Medical Center under his care on July 2, 2005. It was obvious on admission that she was very sick. Doctor Hunter testified that he always gets an x-ray with Gastrografin dye when replacing a PEG tube, and that it is surprising to him that a doctor would replace a PEG tube and not get an x-ray with Gastrografin dye.[5] When an x-ray with Gastrografin dye revealed that the PEG tube looked to be in place, but that Ms. Blackshear's condition did not improve, Doctor Hunter ordered a CT scan, saw that the PEG tube was out of place, and placed Ms. Blackshear in the care of Doctor McGinity, a general surgeon, for possible surgical treatment. Doctor Hunter testified at trial that he had reviewed all of the pertinent records and concluded that the laceration was caused by the PEG tube placement by Doctor Tan. Doctor Hunter further testified that when replacing a PEG tube, "you have to be right . . . I always thought in the interest of my patients, it [is] worth the most aggressive measure to insure the placement [is] right."

The jury saw the video deposition testimony of Doctor Ronald Paynter. Doctor Paynter gave his deposition in lieu of trial testimony and testified as an expert in emergency medicine and medical management. According to Doctor Paynter's deposition testimony, at the time of the deposition, he had replaced roughly 300 PEG tubes within a thirty-year period. Doctor Paynter testified that the use of Gastrografin dye in an x-ray is the "gold standard" for determining

---

[5] An x-ray with Gastrografin dye is a procedure during which dye is inserted, in this case, through the feeding tube prior to the x-ray. When the x-ray is performed, the dye is visible and doctors are able to determine where the dye is going and being, or not being, contained.

whether a PEG tube has been properly replaced. He testified that auscultation and aspiration can be used, but neither are as reliable as using the Gastrografin dye and x-ray. When Doctor Paynter was asked if he believed that Doctor Tan tore Ms. Blackshear's stomach when he replaced her PEG tube, Doctor Paynter said, "There was really very little that happened after that . . . [h]e was the only one who manipulated the area." When asked if Doctor Paynter believed that the replacement of the tube and subsequent laceration caused Ms. Blackshear's death, Doctor Paynter expressed that he did believe that the replacement, laceration, and inflammatory response of peritonitis caused Ms. Blackshear's death.

Doctor Michael McGinity testified as an expert in general surgery via video deposition. At the time of his testimony, Doctor McGinity stated that he had surgically placed at least 200 PEG tubes in the last twenty years, and he has also replaced about two to three PEG tubes a year at patients' bedsides. Doctor McGinity testified that in replacing PEG tubes, he usually aspirates to ensure proper placement of the tube. He further testified that he would get a film if he was worried about it. Doctor McGinity saw Ms. Blackshear on July 3, 2005. After viewing a CT scan ordered by Doctor Hunter, Doctor McGinity concluded that the PEG tube was out of the stomach, that there was a great deal of fluid in the peritoneal cavity, and there was free air in the abdomen, indicating that the stomach was leaking. When Doctor McGinity began the surgery to attempt to correct the problem, he pulled out the PEG tube that had been replaced by Doctor Tan, and "a large amount of purulent fluid"[6] came out. Doctor McGinity then found a "large laceration" in Ms. Blackshear's stomach, "at the old gastrostomy

---

[6] Doctor McGinity stated that "purulent fluid" refers to pussy and cloudy fluid.

tube site." Doctor McGinity cleaned out the entire abdominal cavity, sewed up the "large" stomach laceration that he discovered, and placed a new PEG tube. Doctor McGinity testified that it was obvious to him that the laceration occurred when the PEG tube was replaced by Doctor Tan as "the laceration [was] where the old G-tube was."

Doctor Eulogio Tan, defendant herein, testified at trial that he has roughly thirty years of emergency medicine experience. Doctor Tan testified that he had replaced roughly ten PEG tubes in his career. He saw Ms. Blackshear as an emergency room patient on July 1, 2005. Ms. Blackshear had pulled out her PEG tube and was in the emergency room for replacement. Doctor Tan testified that he did a physical exam of her heart, abdomen, and lungs, which were all reportedly normal. Following the examination, he determined, but did not confirm, that the PEG tube tract was mature and he proceeded to replace the tube. After replacing the PEG tube, Doctor Tan claims that he verified clinically, through auscultation and "some aspiration," that the PEG tube had been replaced correctly, even though no such indication was in the patient's records. Doctor Tan testified that the placement was then clinically verified by a nurse. Once Doctor Tan determined that the PEG tube was in the correct place and that Ms. Blackshear's vitals were stable, he discharged her to return to the nursing home.

As to whether Doctor Tan caused Ms. Blackshear's stomach laceration when he replaced her PEG tube, Doctor Tan said that he definitely disagreed as to that conclusion. Doctor Tan further stated, "I'm sure that I did not cause Ms. Blackshear's laceration." Doctor Tan believes that he did not breach the applicable standard of care.

As set forth above, the jury heard the testimony of five different doctors, three of which had direct contact with Ms. Blackshear prior to or during the events in question. Doctor Hunter admitted Ms. Blackshear to the emergency room at Rapides Regional Medical Center and testified that he would have never done a PEG tube replacement without doing a Gastrografin dye x-ray. Doctor McGinity testified, however, that he would have only done an x-ray with Gastrografin dye had he been worried about the replacement of the PEG tube. In addition, Doctor Tan testified that he believes his clinical verification that the PEG tube was in the correct location was, in fact, the standard of care.

As to the doctors that testified that did not have direct contact with Ms. Blackshear, Doctor Paynter testified that the "gold standard" was to use Gastrografin dye, and that the other methods, auscultation and aspiration are less reliable in verifying the proper replacement of a PEG tube. Yet, Doctor Yates testified that clinically verifying the placement through auscultation and/or aspiration is the standard of care in replacing PEG tubes.

Thus, the jury was faced with differing expert opinions as to the applicable standard of care, and concluded that Doctor Tan had, in fact, breached the standard of care. Doctor Tan admitted in brief, "evidence presented at trial did support the jury's finding that Dr. Tan breached the standard of care in failing to order an x-ray with Gastrografin dye to verify that the PEG tube had been properly placed into the stomach." We cannot reverse the jury verdict absent manifest error. We cannot find that the jury was manifestly erroneous in concluding that Doctor Tan had breached the standard of care. Rodney, as plaintiff, thus met the first element required to establish medical malpractice.

If the jury concluded that a breach occurred, the jury was then asked to circle whether the breach by Doctor Tan caused harm to Ms. Blackshear. The verdict form stated, "Do you find by a preponderance of the evidence that defendant, Eulogio L. Tan, M.D., caused harm to Edith Blackshear and Rodney Blackshear?" The jury put an "X" in the blank after "NO _____." The jury concluded that even though Doctor Tan had breached the applicable standard of care, Doctor Tan had not caused harm to Ms. Blackshear. Doctors Hunter, Paynter, and McGinity all testified that they believed that the replacement of the PEG tube caused the stomach laceration, which eventually led to the infection in the peritoneal cavity, and Ms. Blackshear's death. Doctors Yates and Tan testified that they believed something else happened and that Doctor Tan's replacement of Ms. Blackshear's PEG tube had not caused Ms. Blackshear's infection and death. The jury agreed with Doctors Yates and Tan.

A key piece of evidence that was discussed at some length by the testifying doctors was the x-ray that Rodney claims should have been ordered by Doctor Tan in the early hours of July 2, 2005, after he first replaced the PEG tube. The x-ray was in fact ordered by Doctor Hunter and performed on the evening of July 2, 2005, some twenty-one hours later. The x-ray confirmed that the PEG tube was "in a good position" and that the dye, inserted through the PEG tube, "fill[ed] the stomach . . . without obvious evidence of extravasation."

In addition, the medical records at Rapides General showed that the physical exam done on Ms. Blackshear at 4:15 p.m. on July 2, 2005, at Rapides Regional Medical Center by Doctor Hunter revealed that the abdomen, while tender, was full, soft and not bulging" Doctors Hunter and Yates testified that at times Ms. Blackshear's stomach was hard, a sign of peritonitis. A CT scan taken on July 3,

12

2005, at 10:30 a.m. showed that the PEG tube was completely out of the stomach, leading Doctor Hunter to call Doctor McGinity to perform surgery. The x-ray with Gastrografin dye taken by Doctor Hunter the evening before on July 2, 2005, however, confirmed that the PEG tube was in place. What happened in the interim is the question that remains unanswered.

Doctor Hunter, Doctor McGinity, and Doctor Paynter all testified that, more likely than not, Ms. Blackshear's death was caused by medical malpractice, misplacement of the PEG tube by Doctor Tan causing a tear in the peritoneal cavity, causing infection and the eventual death of Ms. Blackshear. Doctor Tan and Doctor Yates testified that Ms. Blackshear's symptoms were consistent with aspiration pneumonia, a condition that occurs in twenty to thirty percent of patients with PEG tubes. The x-ray showing proper placement of the PEG tube on July 2, 2005, confirms that nothing Doctor Tan did or failed to do caused the stomach tear found by Doctor McGinity during surgery on July 3, 2005. Doctor Yates and Doctor Tan both testified that Doctor Tan's placement of the PEG tube did not cause Ms. Blackshear's infection and eventual death. The opinion of the entire medical review panel introduced into evidence likewise confirmed that nothing that Doctor Tan did or failed to do caused the death of Ms. Blackshear.

Thus, there is a reasonable basis in the record to support the jury's verdict and, based on the record before us, we cannot sat that the jury was manifestly erroneous. Rodney's assignment of error lacks merit. Therefore, we affirm.

## CONCLUSION

We cannot find that the jury was manifestly erroneous in concluding that Doctor Tan breached the standard of care, but that he did not cause harm to Ms.

13

Blackshear or Rodney.  We affirm the judgment of the trial court.  All costs of this appeal are assessed to Rodney Blackshear.

**AFFIRMED.**