STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

BARBARA HOUSSIERE, ET AL.

VERSUS

ASCO USA, ET AL.

\*\*\*\*\*\*\*\*\*\*

APPEAL FROM THE
FIFTEENTH JUDICIAL DISTRICT COURT
PARISH OF ACADIA, NO. 84,068
HONORABLE MARILYN C. CASTLE, DISTRICT JUDGE

\*\*\*\*\*\*\*\*\*\*

PHYLLIS M. KEATY
JUDGE

\*\*\*\*\*\*\*\*\*\*

Court composed of Ulysses Gene Thibodeaux, Chief Judge, John D. Saunders, and Phyllis M. Keaty, Judges.

AFFIRMED.

Donald W. Price
Kirk A. Guidry
Dué, Price, Guidry, Piedrahita & Andrews
8201 Jefferson Highway
Baton Rouge, Louisiana 70809
(225) 929-7481
Counsel for Plaintiffs/Appellants:
    Barbara Houssiere, et al.

Christopher H. Hebert
Rabalais & Hebert
701 Robley Drive, Suite 210
Lafayette, Louisiana 70503
(337) 981-0309
Counsel for Plaintiffs/Appellants:
    Barbara Houssiere, et al.

**David W. Robertson**
**Attorney at Law**
**727 East Dean Keeton Street**
**Austin, Texas 78705**
**(512) 232-1339**
**Counsel for Plaintiffs/Appellants:**
      **Barbara Houssiere, et al.**

**Steve Gunnell**
**Cassidy & Gunnell**
**Post Office Box 1446**
**Jennings, Louisiana 70546**
**(337) 824-7322**
**Counsel for Plaintiffs/Appellants:**
      **Barbara Houssiere, et al.**

**Joe B. Norman**
**Kelly Brechtel Becker**
**Mark L. McNamara**
**Katie Caswell Cambre**
**Liskow & Lewis**
**701 Poydras Street, Suite 5000**
**New Orleans, Louisiana 70139**
**(504) 581-7979**
**Counsel for Defendant/Appellee:**
      **BP America Production Company**

**George Arceneaux, III**
**Penny L. Malbrew**
**James D. Rhymes**
**Kyle Polozola**
**Liskow & Lewis**
**822 Harding Street**
**Lafayette, Louisiana 70503**
**(337) 232-7424**
**Counsel for Defendant/Appellee:**
      **BP America Production Company**

**KEATY, Judge.**

Plaintiffs-Appellants appeal from an adverse jury verdict in this oilfield legacy lawsuit in favor of Defendant-Appellee. For the following reasons, we affirm.

## FACTS AND PROCEDURAL BACKGROUND

This oilfield legacy lawsuit was instituted by Plaintiffs-Appellants, the Houssiere family (hereinafter Houssieres). This lawsuit seeks to have the Houssieres' property cleaned up by multiple defendants, including Defendant-Appellee, BP America Production Company, the successor to former oil and gas exploration and production operators on the property.[1] The property involved in this case is located in the Jennings oilfield. One of the principal landowners in the Jennings oilfield in the early 1900s was the Houssieres' ancestor, Eugene Houssiere (Eugene). Eugene formed the Houssiere-Latreille Oil Company (HLOC). HLOC held the property at issue in this lawsuit until the 1950s, when it was liquidated and its assets, including the property at issue, were distributed to family members from whom the Houssieres trace their chain of title.

Amoco Production Company ("Amoco") was BP's predecessor-in-interest. Amoco's predecessor, Yount-Lee Oil Company ("Yount-Lee"), leased portions of the HLOC lands in 1928 (the 1928 lease). Pursuant to the 1928 lease, Yount-Lee and its successor, Stanolind Oil and Gas Company ("Stanolind"), drilled wells on the property and established production facilities. In 1953, Stanolind released the 1928 lease.

Thereafter, HLOC granted two *new* leases to Stanolind covering portions of the property (the 1953 leases). Stanolind subsequently reduced its activities on the property and released all of the property from coverage of the 1953 leases, except

---

[1] Except when the context requires otherwise, BP and its predecessors will be referred to generally as "BP" throughout this opinion.

for two five-acre tracts surrounding two producing wells. The Houssieres leased the acreage released from Stanolind to other operators. As of 1989, Stanolind and/or its successors no longer operated on the property. Stanolind and/or its successors retained rights for those two producing wells and the five-acre tracts around them until 1991, when Stanolind and/or its successors sold its leasehold interest.

The Houssieres thereafter filed suit in 2006 and pursued claims for specific performance-remediation and remediation damages. In May 2011, BP filed a motion for summary judgment based on, inter alia, the express provision for stipulated damages in an amount of $200 per acre contained in the 1953 leases. The trial court denied BP's motion. BP then filed a motion in limine seeking to exclude all evidence of the dollar amount of damages on the grounds that the Houssieres were seeking specific performance.[2] The trial court subsequently granted BP's motion in limine.

The case was tried to a jury over three separate weeks in August, September, and October 2011. Much of the time at trial dealt with disputes concerning prescription and BP's responsibility for two specific large pits. Both of these issues were the subject of writ grants by this court. Prior to trial on August 25, 2011, this court granted a writ and reversed summary judgment for BP on the basis of prescription. During trial on September 26, 2011, this court reversed a partial directed verdict in favor of BP on the large pits issue. These two rulings left the prescription and large pits issues for the jury to determine. The jury, however, never reached those issues.

_____

[2] As discussed in more detail below, BP filed a Motion in Limine based upon its belief that the Houssieres elected to pursue only specific performance rather than tort damages pursuant to the Houssieres' argument in their opposition brief to BP's motion for summary judgment.

2

Following a verdict finding that BP and its predecessor-in-interest, Amoco, did not cause environmental damage to the Houssieres' property, the Houssieres asked the trial court to set a trial on the amount of the damages found by the jury in interrogatory twelve to have been negligently caused by BP. This motion was denied. Instead, the trial court entered judgment for BP, dismissing all of the Houssieres' claims. The Houssieres perfected this appeal.

## STANDARD OF REVIEW

It is well settled that a court of appeal may not set aside a trial court's or a jury's finding of fact in the absence of "manifest error" or unless it is "clearly wrong," and where there is conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel that its own evaluations and inferences are as reasonable.

*Rosell v. Esco*, 549 So.2d 840, 844 (La.1989), *citing Arceneaux v. Domingue*, 365 So.2d 1330, 1333 (La.1978). "Where there are two permissible views of the evidence, the factfinder's choice between them cannot be manifestly erroneous or clearly wrong." *Id.*

## DISCUSSION

In their appeal, the Houssieres contend the trial court erred in refusing to allow the jury to consider evidence of damages, thereby improperly separating the trial of liability and damages without the Houssieres' consent. The Houssieres allege the jury manifestly erred in finding BP did not breach its contract and there was no environmental damage. The Houssieres contend the trial court erred in admitting irrelevant and prejudicial evidence offered by BP and in excluding relevant and probative evidence offered by the Houssieres, which, in turn, led to erroneous jury findings. Finally, the Houssieres argue the trial court erred by interpreting Act 312 of 2006 to impose substantive limits on the Houssieres' rights under mineral lease contract law and tort law.

3

## I. <u>Bifurcation and Waiver of Tort Damages</u>

The Houssieres refer to the jury's finding in interrogatory twelve wherein the jury found BP negligently caused damage to their property. In light of the jury's finding, the Houssieres contend it was error for the trial court to fail to submit the issue of money damages to the jury. Additionally, the trial court denied the Houssieres' post-verdict motion asking the trial court to set a trial on the amount of damages found by the jury in interrogatory twelve and dismissing the Houssieres' claims. As a result, the Houssieres contend the trial court bifurcated the trial and then canceled the second half in violation of La.Code Civ.P. art. 1562(A), which allows separate trials of liability and damages only "with the consent of all parties."

In opposition, BP contends there was no bifurcation order in this case. BP further argues the Houssieres waived their tort damages claim in their opposition to BP's motion for summary judgment by abandoning their claim for remediation damages, making the decision solely to pursue specific performance. BP contends the Houssieres' argument that they were deprived of their rights to pursue a claim for monetary damages for the alleged contamination despite their explicit election of remedy contradicts the supreme court's decision in *Corbello v. Iowa Production,* 02-826 (La. 2/25/03), 850 So.2d 686.

In the present case, the pertinent article at issue with respect to bifurcation is La.Code Civ.P. art. 1562(A) (emphasis added),which states:

> If it would simplify the proceedings or would permit a more orderly disposition of the case or otherwise would be in the interest of justice, **at any time prior to trial the court may order**, with the consent of all parties, separate trials on the issues of liability and damages, whether or not there is to be a jury trial on either issue.

*See also Davis v. Am. Home Prods. Corp.,* 02-0942 (La.App. 4 Cir. 3/26/03), 844 So.2d 242 (bifurcation refers to separately phased trials). After a review of the

4

record, we are unable to locate any bifurcation order in accordance with La.Code Civ.P. art 1562.

Additionally, the record contains the following colloquy between the Houssieres' counsel and the trial court during the hearing on BP's motion for summary judgment:

> MR. PRICE: We're not asking BP to write us a check, we're asking to have our property cleaned up through this process. And that's our point. We're not making a punitive damages claim. We're not making -- you know, none of these people are going to claim that their lives were severely disrupted by this damage to their property and they've suffered, you know, grievous mental anguish or anything of that nature.
>
> . . . .
>
> MR. PRICE: We're not asking for a check.
>
> THE COURT: . . . So, what you're saying is that y'all are suing for specific performance.
>
> MR. PRICE: Correct. Correct. [W]e didn't say it explicitly. But that is where we are today. We are asking for specific performance. That's what we want.

The record also contains the trial court's judgment denying BP's motion for summary judgment which states, in pertinent part (emphasis added):

> Stipulated Damages. BP's Motion for Summary Judgment seeking dismissal of restoration damages claims based on the stipulated damages provision of the two 1953 Mineral Leases is denied, based on the **oral stipulation that Plaintiffs' claims are limited to claims for specific performance of actual remedial work claimed, pursuant to La.R.S. 30:29, rather than for damages**.

The record also contains the transcript of the hearing on BP's motion in limine to exclude evidence of any monetary relief that the Houssieres discussed in their expert reports submitted prior to BP's motion for summary judgment which states, in pertinent part:

> THE COURT: Under the 1953 lease, you're asking for a specific performance. So there should be no issue of damages in this case. And the Court is going to grant the defendant's motion on that.

5

. . . .

MR. PRICE: Well, but -- Your Honor, if I may -- I mean, until recently. Since Act 312, in 2006, was granted, it's been clear that this was going to be a cleanup case, that we were not going to walk away with any money. So --

THE COURT: But you were asking for it.

MR. PRICE: Well, I asked for it. But I asked for it in January of 2006. And the act passed later that year.

The record also contains the trial transcript. In speaking directly to the jury during their opening statement, the Houssieres' counsel explained that "money damages are not an issue in this case" and that "plaintiffs are suing for what's called specific performance of the contract" to have the "property cleaned up." Mr. Price stated that because the Houssieres were suing for specific performance, the jury was "not going to be asked to award any damages in this case."

The foregoing evidence shows the Houssieres did not pursue remediation damages. Rather, the Houssieres pursued a claim for specific performance to have BP remediate any environmental damage to the property. The Houssieres' assertion that the trial court erred in refusing to allow the jury to consider evidence of monetary damages that they expressly elected not to pursue contradicts the supreme court's holding in *Corbello*.[3] Accordingly, the Houssieres' argument that the trial court improperly bifurcated the trial in violation of La.Code Civ.P. art. 1562 is without merit.

---

[3] In *Corbello*, 850 So.2d at 708, the supreme court held, in pertinent part:

We recognize the long-standing rule that ''when a party has been damaged by the conduct of another arising out of a contractual relationship, the former may have two remedies, a suit in contract, or an action in tort, and that he may elect to recover his damages in either of the two actions.'' *Federal Insurance Company v. Insurance Company of North America, et al.*, 262 La. 509, 263 So.2d 871, 872 (1972). However, although plaintiffs argue that Shell's noncompliance under the terms of the contract also constitutes tortious conduct, plaintiffs did not bring a tort suit against Shell. Plaintiffs cannot now attach a claim under 2315.3 onto their breach of contract claim.

6

## II.  Breach of Contract

The Houssieres allege the jury's finding that BP did not breach its contract was manifestly erroneous.  The Houssieres rely heavily upon the testimony of BP's corporate representative, Troy Vickers (Vickers), who testified the pits were not closed because "[w]e [BP] missed these."  The Houssieres contend Vickers' testimony is both an admission that BP inadvertently failed to close pits that should have been closed and an unkept promise that BP would close the pits in accordance with Louisiana Department of Natural Resources (DNR) requirements.  The Houssieres contend Vickers' testimony constitutes BP's confession that it breached its express contractual duty to remediate the open pits and its implied duty to satisfy the reasonably prudent operator standard pursuant to the mineral code, La.R.S. 31:122.[4]

The Houssieres allege the jury erred by answering "no" to interrogatory eight which asked whether BP's breach of its legal duty to close the pits also constituted a breach of the lease.  The Houssieres contend the provisions of the 1953 lease[5] required BP to close the pits on the property, which BP admittedly failed to do.  Because BP, via Vickers, confessed that it never closed the pits, the Houssieres allege the jury's finding that BP did not breach the contract was in error.

---

[4] Louisiana Revised Statutes 31:122 provides:

> A mineral lessee is not under a fiduciary obligation to his lessor, but he is bound to perform the contract in good faith and to develop and operate the property leased as a reasonably prudent operator for the mutual benefit of himself and his lessor.  Parties may stipulate what shall constitute reasonably prudent conduct on the part of the lessee.

[5] Section XI of the 1953 lease provides, in pertinent part:

> Should Lessee dig ditches, reservoirs, etc., Lessee, upon completion or abandonment of each well, shall immediately refill all such ditches, pits or reservoirs and clear the premises of all debris in order to restore the property as nearly as possible to the original condition existing at the time of granting this lease, which condition Lessor now considers satisfactory for rice farming purposes.

The Houssieres contend the jury's finding that there was no "environmental damage" in their answer to interrogatory thirteen was erroneous since the jury found that BP caused damage in interrogatory twelve. The Houssieres allege their experts testified that the safety of the environment was put at risk by the contamination present on this land. Moreover, BP, via Vickers, allegedly confessed that BP did not comply with the regulations set forth in Statewide Order 29-B—regulations that were put in place for the same environmental, health, and safety reasons that prompted the enactment of La.R.S. 30:29, i.e., Act 312. As such, the Houssieres argue the jury's finding that, while the property was damaged, it was not environmentally damaged, is clearly wrong.

In opposition, BP contends it did not breach its contractual obligations. BP argues the Houssieres brought contractual claims under both the 1928 lease and the 1953 lease. The 1928 lease allegedly contained no provision requiring the lessee (Yount-Lee, later Stanolind) to restore the property upon expiration of the lease. While the 1953 lease allegedly included an express provision regarding restoration of the property, namely the obligation to refill any ditches, pits, or reservoirs, BP contends the Houssieres ignore the unambiguous condition that the provision is only applicable "[s]hould the Lessee dig ditches, reservoirs, etc." BP contends the Houssieres, therefore, had the burden of proof to show that BP constructed all of the pits BP allegedly failed to close. Critically, BP contends the Houssieres failed to provide sufficient evidence demonstrating that any of the pits that were not closed were actually dug by Stanolind, Amoco, or BP following the execution of the 1953 lease.

In further opposition, BP contends Vickers did not confess that BP breached its contractual obligations. In discussing the restoration obligation under the 1953 lease, BP alleges Vickers stated that he believed BP exceeded what was required of

8

it, in terms of contractual obligations, by closing a pit that was constructed prior to 1953. BP alleges the Houssieres improperly rely on Vickers' statement regarding Amoco's customary practice in the 1980s to close historic pits that it had used in its operations. BP alleges Amoco's decision to close pits as part of a regulatory regime adopted decades after operations ended cannot be translated into a contractual obligation between the parties.

BP further contends that the Houssieres' argument regarding environmental damage finds no support in the record. The Houssieres allegedly cite to snippets of testimony of their own experts for the proposition that they proved that there is "likely . . . adverse effects to the environment." BP alleges the totality of the testimony of all the experts, both the Houssieres' and BP's, fully supports the jury's finding of no environmental damage.

In the present case and with respect the breach of contract issue, the record contains Vickers' testimony which provides, in pertinent part:

> A. That pit was being used before this '53 lease. And so I think we exceeded what was required here in the '53 lease.
>
> . . . .
>
> A. By closing that pit.

The record also contains the following colloquy between the Houssieres' counsel and Vickers:

> Q. Notwithstanding BP's willingness today to go out and close these pits that you've talked about, the fact of the matter is, 25 years ago, they were required to do that, and it did not happen; is that correct?
>
> . . . .
>
> A. [W]e were regulatorily required to close the pits. We were regulatorily required to document the pits. So 29(B) regulations were there.

9

I'm not doubting -- not saying that we didn't comply with 29(B). And we'll have to deal with that issue -- not through this court but we'll have to deal with the regulatory agencies on that.

After reviewing the record, we find the Houssieres' use of Vickers' testimony as a purported judicial confession that BP breached its contract is misplaced. The record shows that Vickers was clear in distinguishing between compliance with standards and contracts that applied in the 1920s through the 1950s, when the pits were used, and latter-day regulatory practices. Importantly, Vickers' testimony does not support a reversal of the trial court's decision because his testimony does not establish that Stanolind, Amoco, or BP failed to close any pits established after 1953, as would be required to find a breach of contract. The jury, therefore, did not err in finding BP did not breach its contractual obligations. The jury's finding is affirmed in this regard.

With respect to the environmental damage issue, the record contains the testimony of the Houssieres' expert, Dr. Sherwood Gagliano (Dr. Gagliano).[6] Dr. Gagliano tested for alleged contamination only in small, discrete areas of the property, primarily the two large earthen storage tanks that BP maintained it did not use. The Houssieres' expert, Dr. William J. Rogers (Dr. William Rogers),[7] admitted, "I have some data, but I don't have the data that I need." The Houssieres' expert, Dr. Gary Barbee (Dr. Barbee),[8] also explained that he did not do an actual toxicological analysis, but instead performed a preliminary screening level risk assessment which is intentionally biased toward finding potential contamination which can be ruled out by further analysis. Dr. William Rogers

---

[6] The Houssieres tendered Dr. Gagliano as an expert in the fields of geology, geography, archeology, environmental science, and interpretation of aerial photography and imagery.

[7] The Houssieres tendered Dr. William Rogers as an expert in ecological risk assessment.

[8] The Houssieres tendered Dr. Barbee as an expert in the fields of toxicology, human and ecological health risk assessment, and soil science.

10

further conceded that all he had was a "hypothesis," and that "more work needs to be done, in terms of characterizing it and assessing -- fully assessing the ecological risk presented by the site." Finally, Dr. William Rogers admitted that if he had performed a full-blown toxicological analysis, instead of the preliminary screening assessment, he could have definitively determined if there was not a risk to the property.

On the other hand, the record shows that BP's expert, Dr. Glenn Millner (Dr. Millner),[9] refuted the notion espoused by the Houssieres' experts that the exceedance of an initial screening standard translates into potential risk of harm or contamination. BP's expert, Brent Pooler (Pooler),[10] performed additional testing in order to achieve a more accurate, "site-specific" conclusion than that gleaned from the Houssieres' experts' initial screening standard. As a result, Pooler concluded that there are "no limitations to the potential uses of the property," which was confirmed by Dr. Millner.

The record also contains the testimony of BP's expert in ecological toxicology, Dr. John Rodgers (Dr. John Rodgers). He provided testimony and documentation evidencing a population of animals and vegetation on the property, further confirming Pooler's conclusion that the property was not contaminated. Dr. John Rodgers' site inspection of the property revealed evidence of (i) extensive growth of new trees, sensitive ferns that require clean water for growth, sensitive cattail plants that require similar growing conditions as rice farming, and (ii) deer and other animals living on the property. Dr. John Rodgers' conclusion was that there is no current or future ecological risk on the property.

---

[9] BP tendered Dr. Millner as an expert in toxicology and risk assessment, including the LDEQ's RECAP regime.

[10] BP tendered Pooler as an expert in geology.

11

In essence, the jury was provided with competing opinions. "'[W]hen the district court has allowed both parties to present their experts before making its factual determinations, the fact finder's choice of alternative permissible views cannot be considered to be manifestly erroneous or clearly wrong.'" *Dumesnil v. Sw. La. Elec. Membership Corp.*, 08-982, p. 6 (La.App. 3 Cir. 2/4/09), 2 So.3d 1254, 1258, *quoting Toston v. Pardon*, 03-1747 (La. 4/23/04), 874 So.2d 791. Faced with these differing opinions, and pursuant to the foregoing evidence, we find the jury was not manifestly wrong in finding no environmental damage to the property. The jury's conclusion is affirmed in this regard.

## III. <u>Evidentiary Errors</u>

The Houssieres contend the trial court admitted irrelevant and prejudicial evidence offered by BP. Prior to trial, the Houssieres moved to exclude numerous photographs of the early development of the Jennings oilfield offered by BP on the grounds they did not depict the property at issue or conditions that existed on the property. Additionally, BP's expert, Tonja Koob (Koob),[11] testified about how things were done in the early oil business. Koob testified about oilfield practices at Spindletop in Beaumont, Texas. The Houssieres contend the twenty-six photographs and Koob's testimony led the jury to infer that such conditions had long existed on the Houssieres' property, going back before BP's involvement with the property, and could have caused the environmental damage that exists on their property.

The Houssieres allege the trial court excluded relevant and probative evidence offered by them. First, the trial court excluded photographs submitted by the Houssieres of other oilfield properties where BP's expert, Arville Touchet

_____

[11] BP tendered Koob as an expert in environmental site assessment and hydrology.

12

(Touchet),[12] conducted the kind of remediation he recommended in the present matter. Since the Houssieres' expert, Dr. Barbee, worked with Touchet on these remediation projects on other property, the trial court also limited Dr. Barbee's testimony about the test results relating to these other projects on other property. Second, the trial court refused to allow the Houssieres to present evidence of the cost of remediation. Third, the trial court limited the testimony of the Houssieres' experts, Dr. William Rogers and Dr. Barbee, by preventing them from testifying that the contamination present on the Houssieres' property likely posed a risk to the environment and human health.

In opposition, BP contends the Houssieres' argument regarding the twenty-six photographs and Koob's testimony ignores the standard of review, the probative value of the evidence, and context. BP insists the trial court cautioned the jury multiple times that certain photographs and testimony were not depictions of the specific property at issue, but were a part of the history of the site. The Houssieres' counsel made the very same point in his cross-examination. Therefore, BP argues that any potential prejudice was alleviated by the probative value of the historical background of the property.

BP further alleges the trial court's exclusion of the Houssieres' photographs and the limitation of Dr. Barbee's testimony was proper. BP argues the testimony and photographs involved a dissimilar kind of remediation on a completely separate piece of property that had different crops. Despite the Houssieres' claims that the jury was not able to evaluate the effects of contamination on remediated land, BP contends the trial court allowed Dr. Barbee to testify generally about the failure of the other remediation. BP insists the trial court was within its discretion in limiting irrelevant evidence.

---

[12] Touchet was tendered by BP as an expert soil scientist.

In further opposition, BP contends that while the trial court properly limited the scope of the Dr. William Rogers' and Dr. Barbee's testimony, they were allowed to testify that there was a "potential for impact, damage or injury to human and ecological populations" that warranted further evaluation. Drs. William Rogers and Barbee presented what evidence they had, which did not include a full toxicological analysis. The jury then rejected the Houssieres' evidence. Thus, BP contends the Houssieres were not prejudiced.

Louisiana Code of Evidence Article 401 states that relevant evidence is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Relevant evidence, however, may be excluded if its probative value is outweighed by "the danger or unfair prejudice." La.Code Evid. art. 403. Having determined that their probative value outweighed any prejudicial effect, the trial court's ruling admitting the photographs and Koob's testimony cannot be disturbed unless a clear abuse of discretion is shown. *See Brown v. Catalyst Recovery of La., Inc.*, 01-1370 (La.App. 3 Cir. 4/3/02), 813 So.2d 1156, *citing Quibodeaux v. Med. Ctr. of Sw. La.*, 97-204 (La.App. 3 Cir. 3/6/98), 707 So.2d 1380, *writ denied*, 98-926 (La. 5/15/98), 719 So.2d 465.

In the present case, the twenty-six photographs contained in the record depict the early development of the Jennings oilfield. As mentioned above, the Jennings oilfield was the site of Louisiana's first oil well, and the Houssieres' ancestors largely oversaw its development. The twenty-six photographs show what was happening on the Jennings oilfield. The photographs also show, as the trial court stated for the record, the Houssieres' "knowledge that property was damaged by oil field drilling operations."

In rejecting the Houssieres' argument, the trial court further noted:

THE COURT:  And this is all argument that can be made to the jury.  I'm going to let the pictures in, because I think they are relevant in relation to what was happening on the property, certainly subject to -- I think these are just other sets of it -- subject to your right to --

. . . .

THE COURT:  . . . cross examine about those pictures and what they might depict.

Based upon the foregoing, we conclude that the trial court properly considered the probative versus potentially prejudicial value of the twenty-six photographs and did not abuse its discretion in admitting them.  We affirm the trial court's ruling allowing the twenty-six photographs.

With respect to Koob's testimony, the record shows that she was accepted, without objection by the Houssieres' counsel, as an environmental site assessment and hydrology expert.  That expertise included site history.  Crucial to the site history was an explanation of the development of the Jennings oilfield, including operations that impacted the area, that occurred with the full knowledge of the Houssieres' ancestors and which predated any involvement by BP or its predecessors.  Some of Koob's evidence also concerned pits located on the Houssieres' property which were the primary focus of their damages claims.  Accordingly, the trial court properly considered the probative versus prejudicial value of Koob's testimony and did not abuse its discretion in allowing her testimony.  We affirm the trial court's ruling allowing Koob's testimony.

With respect to the Houssieres' argument that the trial court improperly limited the testimony of their expert, Dr. Barbee, and excluded certain photographs of other remediated property, the record provides:

THE COURT:  Okay.  I'm not allowing any of those photographs from another piece of property. . . .

. . . .

15

THE COURT: But the fact that another remediation -- which this witness said was not according to what he had asked for -- didn't work is not relevant in this case.

. . . .

THE COURT: Well, we're talking about sugarcane and beans, as opposed to rice [in this case]. So we're not even talking about the same crop. . . .

The foregoing shows the trial court excluded the testimony and photographs as they both involved a dissimilar kind of remediation on a separate piece of property that had different crops, i.e., sugarcane and beans versus rice. The trial court properly recognized that such information was not relevant. Accordingly, the trial court did not abuse its discretion in excluding the photographs and limiting Dr. Barbee's testimony. We affirm the trial court's ruling in this regard.

With respect to the Houssieres' cost-remediation argument, and as we discussed in Section I above, the Houssieres expressly disclaimed remediation damages in favor of specific performance. Therefore, evidence of damages and the methodology and costs of remediation was irrelevant and properly excluded. We affirm the trial court's ruling in this regard.

With respect to the Houssieres' argument regarding the limitation of Dr. William Rogers' and Dr. Barbee's testimonies that contamination on the Houssieres' property likely posed a risk to the environment and human health, the record provides the trial court's ruling on BP's motion to exclude or limit testimony:

[Dr. William Rogers'] conclusion is not supported by RECAP or any of the EPA standards on which it is based. . . .

The opinions of these experts that ecological populations both on and adjacent to the property have been adversely affected by the contaminants and that the contaminants will be a source of exposure and health risks to human and ecological populations for a significant and unacceptable period of time if not removed or remediated do not

16

have a reliable basis in the knowledge and experience of the field of toxicology.

Based on the foregoing, we find that the trial court did not abuse its discretion given that such testimony was not supported by RECAP or any of the EPA standards. The trial court's ruling is affirmed in this regard.

## IV. Act 312 of 2006

The Houssieres allege the trial court's post-verdict reading[13] of Act 312 was incorrect as it contradicted the jury instructions. Specifically, one section of the jury instructions provided that the Houssieres were potentially entitled to breach-of-contract damages and/or tort damages (with no duplication). In another section entitled "Procedure Under La. R.S. 30:29," the jury instructions provided that the Houssieres were potentially entitled to require BP to fund a court-approved/DNR-designed cleanup and to pay the Houssieres investigative and related costs. This was allegedly the basis on which the case went to the jury, and it was the basis on which the jury found in interrogatory twelve that BP was responsible for the negligently-caused damages.

The Houssieres contend that, after the verdict, the trial court completely changed its mind and held that all of the Houssieres' damage claims were subsumed, absorbed, or preempted by the "Procedure Under La. R.S. 30:29." The trial court accepted BP's argument that Act 312 foreclosed contamination damages that are not "environmental." As such, the Houssieres allege the trial court's post-

---

[13] The opinion's reference to "post-verdict" means the Houssieres' Motion to Set for Trial on Damages, which they filed on October 7, 2011. BP opposed the motion and argued that Act 312 "preempts the field" of oil and gas related contamination of property, leaving landowners with only three remedies: DNR-designed cleanup of environmental damages as defined in *Meaux v. Hilcorp Energy Co.*, 09-591 (La.App. 3 Cir. 12/9/09), 26 So.3d 875, *writ denied*, 10-441 (La. 4/30/10), 34 So.3d 194; consequential damages resulting from such environmental damage, and; damages specified in an "express contractual provision." The trial court accepted BP's argument and entered judgment in favor of BP.

17

verdict reading of Act 312 was incorrect as the trial court's post-verdict ruling contradicted its jury instructions.

The Houssieres further contend the trial court misinterpreted Act 312 pursuant to this court's decision in *State v. Louisiana Land and Exploration Co.,* 10-1341 (La.App. 3 Cir. 2/1/12), 85 So.3d 158, *writ granted,* 12-884 (La. 6/15/12), 92 So.3d 340. In *Louisiana Land*, we held that the owners of property contaminated by excessive or unreasonable mineral lessee operations are not limited to DNR clean-up benefits but are also entitled to recover excess remediation damages. The Houssieres contend that our court's holding in *Louisiana Land* is sufficient to require reversal of the trial court's ruling.

In opposition, BP contends the Houssieres "have it completely backwards." BP alleges that it was the Houssieres who asserted that their entire claim was "all" Act 312, whereas the trial court correctly noted that Act 312 only provides a procedure to enforce a remedy flowing from an underlying cause of action. BP contends Act 312, by its express terms, does not establish an independent cause of action.

BP further refers to *M.J. Farms, Ltd. v. Exxon Mobil Corp.*, 07-2371 (La. 7/1/08), 998 So.2d 16, wherein the Louisiana Supreme Court made clear in upholding the constitutionality of Act 312 that the law was procedural, not substantive, in nature. In other words, BP reads *M.J. Farms* to mean that there must be some substantive basis, whether in contract or tort, upon which a plaintiff states a cause of action for remediation of its property. Whatever that cause of action is, BP contends Act 312 supplies the mandatory restoration standard and procedure pursuant to *M.J. Farms*. According to BP, that is exactly how the trial court applied Act 312 to the Houssieres' claims.

18

In the present case, and contrary to the Houssieres' assertion, the trial court did not improperly apply Act 312 to the Houssieres' claims. Moreover, the trial court's application of Act 312 does not conflict with this court's decision in *Louisiana Land*. *Louisiana Land* held that claims for excess remediation damages outside of Act 312 are available in land contamination cases. As demonstrated in the following colloquy, the Houssieres maintained throughout trial that their claims were "all Act 312":

> MR. GUIDRY: The entire claim is under Act 312. It's all covered by Act 312.
>
> THE COURT: No. The remedy is all Act 312. The claim is not all 312. The remedy is all Act 312.

This, indeed, is the critical point on this argument. The Houssieres never articulated a claim or presented evidence to support any recovery outside of remediation of environmental damage within the ambit of Act 312. Act 312 addresses remediation of oilfield sites to meet applicable environmental regulations. All of the Houssieres' "damages" claims, including their proffered monetary damages, relate to the cost of performing remediation and compliance with these public regulations in a way that is subject to Act 312. Thus, even assuming that some additional private right of action for remediation might exist under *Louisiana Land*, the Houssieres never articulated such a claim, and never proffered evidence under such a theory. On the contrary, the Houssieres made an affirmative election to present their claims exclusively for environmental damage under Act 312. Consequently, *Louisiana Land* has no application to this case.

Additionally, the Houssieres' post-verdict motion for a new trial on damages based upon the jury's answer to interrogatory twelve was an attempt to get a second bite at the apple after the jury rejected their claims. The trial court recognized that the jury interrogatories were set up to address the Houssieres'

19

claims as they were presented at trial, namely for environmental damage with the remedy of a cleanup. The jury, however, rejected those claims when it answered "no" to any environmental damage in response to interrogatory thirteen. The verdict form properly tracks the Houssieres' claims under Act 312 as presented at trial, and the jury's answers to the interrogatories wholly comport with the evidence. Accordingly, we find the trial court properly applied Act 312 to the Houssieres' claims and affirm the trial court's ruling in this regard.

## CONCLUSION

The Houssieres have asked this court to reverse the jury verdict based on a theory of recovery that they expressly abandoned at trial and that is contrary to law. We find the jury verdict is supported by the law and the factual record. Accordingly, we affirm the trial court's ruling.

## DECREE

The judgment of the trial court is affirmed. All costs of this appeal are assessed against the Houssieres.

**AFFIRMED.**